UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

SQWIN SA                            §
                                    §
v.                                  §       CIVIL NO. 4:22-CV-1040-SDJ
                                    §
WALMART INC.                        §
                                    §

## MEMORANDUM OPINION AND ORDER

On November 2, 2023, the Court held a hearing to determine the proper construction of the disputed claim terms in United States Patent No. 10,043,176 ("'176 Patent"), U.S. Patent No. 10,621,572 ("'572 Patent"), and U.S. Patent No. 11,195,168 ("'168 Patent"). Having considered the parties' briefs and arguments at the *Markman* hearing, (Dkt. #29, #30, #31, #33, #34), the intrinsic and extrinsic evidence, and the applicable law, the Court issues this Claim Construction Order. *See Teva Pharms. USA v. Sandoz, Inc.*, 574 U.S. 318, 331–32, 135 S.Ct. 831, 190 L.Ed.2d 719 (2015); *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc).

### I.  BACKGROUND

Plaintiff SQWIN SA ("SQWIN") alleges that Defendant Walmart Inc. ("Walmart") has infringed and continues to infringe the '176 Patent, '572 Patent, and '168 Patent (collectively, "the Asserted Patents").[1]

### *The '176 Patent*

The '176 Patent, titled "Online Transaction System," was filed on December 4,

---

[1] Before the start of the claim-construction hearing, the Court provided the parties with preliminary constructions, with the aim of focusing the parties' arguments and facilitating discussion.

2013, and issued on August 7, 2018. This patent generally relates to a secure financial

transaction system for cashless transactions. '176 Patent col. 1 ll. 5–20.

The Abstract of the '176 Patent states:

> A method for performing a digital transaction via a mobile device using a POS system that is connected to a wireless local area network comprising the steps: generation of a unique one-time digital code by the POS system (or by the mobile device of the customer) that is used for initiating the transaction; automatic enabling of network access to the wireless local area network after production of the unique one-time digital code, wherein access to the wireless network is permitted by the digital code; connection of the mobile device to the local area network using the digital code and provision of information from the device to the POS system, after the information has been obtained by the POS system from the mobile device, the POS system provides clearance for the transaction.

Claim 1 of the '176 Patent is an illustrative claim and recites the following

elements (disputed terms in italics):

> 1. A method for performing a financial transaction via a mobile device and a point-of-sale (POS) system, the method comprising the steps of:
> utilizing the *POS system* to generate a unique digital code that identifies the financial transaction;
> communicating the unique digital code from the POS system to the mobile device;
> connecting the mobile device to a *wireless network* associated with the POS system, wherein the mobile device uses the unique digital code as a *password* to connect to the wireless network, the unique digital code is a one-time code that can only be used once as the *password*;
> forwarding, from the mobile device to the *wireless network*, a mobile identifying code that identifies the mobile device, the mobile identifying code including at least one of an international mobile subscriber identity (IMSI) number, an international mobile equipment identity (IMEI) number, and a media access control (MAC) address;

forwarding, from the *wireless network* to the mobile device, a network identifying code that identifies the *wireless network*, the network identifying code including at least one of an IMSI number, an IMEI number, and a MAC address;

generating transaction data associated with information regarding the financial transaction;

transmitting the transaction data, the unique digital code, the mobile identifying code, the network identifying code, and account information associated with the *POS system* from the *POS system* to a *payment system* via a *first digital network path;*

transmitting in parallel the unique digital code, the mobile identifying code, the network identifying code, and account information associated with a user of the mobile device from the mobile device to the *payment system* via a *second digital network path*;

determining, by the *payment system*, whether the unique digital code, mobile identifying code, and network identifying code transmitted from the *POS system* via the *first digital network path* matches the unique digital code, mobile identifying code, and network identifying code transmitted by the mobile device via the *second digital network path*; and

offering clearance of the financial transaction by the *payment system* when the codes transmitted from the *POS system* match the codes transmitted by the mobile device.

'176 Patent col. 9 ll. 11–58.

### *The '572 Patent*

The '572 Patent, titled "Online Transaction System," was filed on October 1, 2019, and issued on April 14, 2020. This patent generally relates to a secure financial transaction system for cashless transactions. '572 Patent col. 1 ll. 6–23.

The Abstract of the '572 Patent states:

Performing a financial transaction via a mobile device and a point-of-sale (POS) system may include utilizing the POS system to generate a digital code, communicating the digital code from the POS system to the mobile device, connecting the mobile device to a wireless network using

the digital code as a password, forwarding a mobile identifying code, forwarding a network identifying code, transmitting transaction data associated with information regarding the financial transaction, the digital code, the mobile identifying code, the network identifying code, and account information associated with the POS system from the POS system to a payment system via a first digital network path, and transmitting the digital code, the mobile identifying code, the network identifying code, and account information associated with a user of the mobile device from the mobile device to the payment system via a second digital network path.

Claim 1 of the '572 Patent is an illustrative claim and recites the following elements (disputed terms in italics):

1. A method for performing a financial transaction via a mobile device and a point-of-sale (POS) system, the method comprising the steps of:

utilizing the *POS system* to generate a unique digital code that identifies the financial transaction;

communicating the unique digital code from the *POS system* to the mobile device, wherein the mobile device connects to a *wireless network* associated with the *POS system* using the unique digital code as a *password*, the unique digital code is a one-time code that can only be used for the financial transaction;

forwarding, from the mobile device to the *wireless network*, a mobile identifying code that identifies the mobile device, the mobile identifying code including at least one of an international mobile subscriber identity (IMSI) number, an international mobile equipment identity (IMEI) number, and a media access control (MAC) address;

forwarding, from the *wireless network* to the mobile device, a network identifying code that identifies the *wireless network*;

transmitting transaction data associated with information regarding the financial transaction, the unique digital code, the mobile identifying code, the network identifying code, and account information associated with the *POS system* from the *POS system* to a *payment system* via a *first digital network path*;

4

transmitting the unique digital code, the mobile identifying code, the network identifying code, and account information associated with a user of the mobile device from the mobile device to the *payment system* via a *second digital network path*;

receiving from the *payment system* an indication as to whether the unique digital code, mobile identifying code, and network identifying code transmitted from the *POS system* via the *first digital network path* matches the unique digital code, mobile identifying code, and network identifying code transmitted by the mobile device via the *second digital network path*; and

offering clearance of the financial transaction by the *POS system* when the indication indicates that the codes transmitted from the *POS system* match the codes transmitted by the mobile device.

'572 Patent col. 9 l. 41 – col. 10 l. 16.

### The '168 Patent

The '168 Patent, titled "Online Transaction System," was filed on August 7, 2018, and issued on December 7, 2021. This patent generally relates to a secure financial transaction system for cashless transactions. '168 Patent col. 1 ll. 7–25.

The Abstract of the '168 Patent states:

A financial transaction may include utilizing a POS system to generate a unique one-time digital code that identifies the financial transaction, forwarding the unique digital code and a store identifying code that identifies the specific POS system, generating transaction data, transmitting the transaction data, the unique digital code, the store identifying code, and account information associated with the POS system from the POS system to a payment system via a first digital network path, transmitting the unique digital code, the store identifying code, and account information associated with a user of the mobile device from the mobile device to the payment system via a second digital network path, and determining whether the unique digital code and store identifying code transmitted via the

first digital network path match the unique digital code and store identifying code transmitted via the second digital network path.

Claim 1 of the '168 Patent is an illustrative claim and recites the following elements (disputed terms in italics):

1. A method for performing a financial transaction via a mobile device and a point-of-sale (POS) system, the method comprising the steps of:

obtaining a unique one-time digital code that identifies the financial transaction;

communicating, from the *POS system* to the mobile device, the unique digital code, wherein the mobile device connects to a *network* using the unique digital code, the unique digital code is a one-time *password* that identifies the financial transaction when connecting to the *network*;

generating by the *POS system* transaction data associated with information regarding the financial transaction;

transmitting the transaction data, the unique digital code, and information associated with the *POS system* from the *POS system* a *first digital network path*;

transmitting the unique digital code and account information associated with a user of the mobile device from the mobile device via a *second digital network path*;

receiving an indication as to whether the unique digital code transmitted from the *POS system* via the *first digital network path* match the unique digital code transmitted by the mobile device via the *second digital network path*; and

offering clearance of the financial transaction when the code transmitted from the *POS system* match the code transmitted by the mobile device.

'168 Patent col. 9 ll. 41–67.

## II. APPLICABLE LAW

### A. Claim Construction

A "bedrock principle" of patent law is that "the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips*, 415 F.3d at 1312 (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To determine the meaning of the claims, courts start by considering the intrinsic evidence. *Id.* at 1313; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs. v. Covad Commc'ns Grp.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). The intrinsic evidence includes the text of the claims themselves, the specification, and the prosecution history. *Phillips*, 415 F.3d at 1314–17; *C.R. Bard*, 388 F.3d at 861. The general rule—subject to certain specific exceptions discussed *infra*—is that each claim term is construed according to its ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the patent. *Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003); *Azure Networks, LLC v. CSR PLC*, 771 F.3d 1336, 1347 (Fed. Cir. 2014) ("There is a heavy presumption that claim terms carry their accustomed meaning in the relevant community at the relevant time." (quotation omitted)), *vacated sub nom. on other grounds*, *CSR PLC v. Azure Networks, LLC*, 575 U.S. 959, 135 S.Ct. 1846, 181 L.Ed.2d 720 (2015) (mem.).

Courts start with the "actual words" of the claims. *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998); *see also Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1298 (Fed. Cir. 2014) (quoting *In re Hiniker Co.*,

150 F.3d 1362, 1369 (Fed. Cir. 1998)) ("[I]n all aspects of claim construction, 'the name of the game is the claim.'"), *overruled on other grounds by Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015) (en banc). And when looking to those words, a term's context in the asserted claim can be instructive. *Phillips*, 415 F.3d at 1314. Other asserted or unasserted claims can also aid in determining the claim's meaning because claim terms are typically used consistently throughout the patent. *Id*. Differences among the claim terms can also assist in understanding a term's meaning. *Id*. For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id*. at 1314–15.

Following examination of the text of the claim itself, courts analyze the claim in light of the specification. Claims "must be read in view of the specification, of which they are a part." *Id*. at 1315 (citing *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)). The specification "is always highly relevant to the claim construction analysis" and is usually "dispositive." *Id*. (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *accord Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). Indeed, the specification "is the single best guide to the meaning of a disputed term." *Id*.

But while "the specification may *aid* the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be *read into* the claims." *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (citing *Constant v. Advanced*

8

*Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)) (emphases added); *accord Phillips*, 415 F.3d at 1323. In fact, "it is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004).

The last piece of intrinsic evidence, the prosecution history, is another tool to supply the proper context for claim construction. Like the specification, the prosecution history provides evidence of how the U.S. Patent and Trademark Office ("PTO") and the inventor understood the patent. *Phillips*, 415 F.3d at 1317. Yet courts should analyze the history with caution because it merely "represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation" and thus "often lacks the clarity of the specification," rendering it "less useful for claim construction purposes." *Id.*; *see also Athletic Alts., Inc. v. Prince Mfg.*, 73 F.3d 1573, 1580 (Fed. Cir. 1996) (noting that ambiguous prosecution history may be "unhelpful as an interpretive resource").

Finally, extrinsic evidence can also be useful, but it is "less significant than the intrinsic record in determining 'the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard*, 388 F.3d at 862). For example, technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but those sources may provide definitions that are too broad or may not be indicative of

9

how the term is used in the patent. *Id*. at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and in determining the meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition are entirely unhelpful to a court. *Id*. Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id*. The Supreme Court recently explained the role of extrinsic evidence in claim construction:

> In some cases, however, the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period. *See, e.g., Seymour v. Osborne*, 11 Wall. 516, 546 (1871) (a patent may be "so interspersed with technical terms and terms of art that the testimony of scientific witnesses is indispensable to a correct understanding of its meaning"). In cases where those subsidiary facts are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence. These are the "evidentiary underpinnings" of claim construction that we discussed in *Markman*, and this subsidiary factfinding must be reviewed for clear error on appeal.

*Teva Pharms. USA*, 574 U.S. at 331–32.

## B. Departing from the Ordinary Meaning of a Claim Term

There are "only two exceptions to [the] general rule" that claim terms are construed according to their plain and ordinary meaning: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of the claim term either in the specification or during prosecution."[2]

---

[2] Some cases have characterized other principles of claim construction as "exceptions" to the general rule, such as the statutory requirement that a means-plus-function term is construed to cover the corresponding structure disclosed in the specification. *See, e.g.*, *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1367 (Fed. Cir. 2002).

*Golden Bridge Tech., Inc. v. Apple Inc.*, 758 F.3d 1362, 1365 (Fed. Cir. 2014) (quoting

*Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)); *see*

*also GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014)

("[T]he specification and prosecution history only compel departure from the plain

meaning in two instances: lexicography and disavowal."). The standards for finding

lexicography or disavowal are "exacting." *GE Lighting*, 750 F.3d at 1309.

"To act as its own lexicographer, a patentee must 'clearly set forth a definition

of the disputed claim term,' and 'clearly express an intent to define the term.'" *Id.*

(quoting *Thorner*, 669 F.3d at 1365). The patentee's lexicography must appear "with

reasonable clarity, deliberateness, and precision." *Renishaw*, 158 F.3d at 1249

(quoting *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994)).

To disavow or disclaim the full scope of a claim term, the patentee's statements

in the specification or prosecution history must amount to a "clear and unmistakable"

surrender. *Cordis Corp. v. Bos. Sci. Corp.*, 561 F.3d 1319, 1329 (Fed. Cir. 2009)

(quoting *Free Motion Fitness, Inc. v. Cybex Int'l, Inc.*, 423 F.3d 1343, 1352–53

(Fed. Cir. 2005)); *see also Thorner*, 669 F.3d at 1366 ("The patentee may demonstrate

intent to deviate from the ordinary and accustomed meaning of a claim term by

including in the specification expressions of manifest exclusion or restriction,

representing a clear disavowal of claim scope." (citation omitted)). And "when an

applicant's statements are amenable to multiple reasonable interpretations, they

cannot be deemed clear and unmistakable." *3M Innovative Props. Co. v. Tredegar

Corp.*, 725 F.3d 1315, 1326 (Fed. Cir. 2013); *see also Avid Tech., Inc. v. Harmonic,*

*Inc.*, 812 F.3d 1040, 1045 (Fed. Cir. 2016) ("When the prosecution history is used solely to support a conclusion of patentee disclaimer, the standard for justifying the conclusion is a high one.").

But while a statement of lexicography or disavowal must be exacting and clear, it need not be "explicit." *See Trs. of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1364 (Fed. Cir. 2016) ("[A] patent applicant need not expressly state 'my invention does not include X' to indicate his exclusion of X from the scope of his patent . . . ."). Lexicography or disavowal can be implied when, for example, the patentee makes clear statements characterizing the scope and purpose of the invention. *See On Demand Mach. Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331, 1340 (Fed. Cir. 2006) ("[W]hen the scope of the invention is clearly stated in the specification, and is described as the advantage and distinction of the invention, it is not necessary to disavow explicitly a different scope."). But if the patentee expresses neither an explicit or implied lexicography or disavowal, the plain meaning governs. *Trs. of Columbia Univ.*, 811 F.3d at 1364 n.2.

### C.  Means-Plus-Function Claims Governed by 35 U.S.C. § 112(f)

The essential inquiry of whether a claim limitation is subject to the means-plus-function strictures of Section 112(f) is whether "the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure." *Williamson*, 792 F.3d at 1348; *Greenberg v. Ethicon Endo-Surgery, Inc.*, 91 F.3d 1580, 1583 (Fed. Cir. 1996) ("What is important is not simply that a "detent" or "detent mechanism" is defined in terms of what it

does, but that the term, as the name for structure, has a reasonably well understood meaning in the art.").

The use or omission of the word "means" is not dispositive, but does raise a rebuttable presumption:

> When the claim uses the word "means," our cases have been consistent in looking to the meaning of the language of the limitation in assessing whether the presumption is overcome. We have also traditionally held that when a claim term lacks the word "means," the presumption can be overcome and § 112, para. 6 will apply if the challenger demonstrates that the claim term fails to "recite[ ] sufficiently definite structure" or else recites "function without reciting sufficient structure for performing that function."

*Williamson*, 792 F.3d at 1348 (citing *Watts v. XL Sys., Inc.*, 232 F.3d 877, 880 (Fed. Cir. 2000)); *see also Zeroclick, LLC v. Apple Inc.*, 891 F.3d 1003, 1007 (Fed. Cir. 2018) ("The failure to use the word 'means' creates a rebuttable presumption that § 112, ¶ 6 does not apply."); *Advanced Ground Info. Sys., Inc. v. Life360, Inc.*, 830 F.3d 1341, 1347 (Fed. Cir. 2016) ("In determining whether this presumption has been rebutted, the challenger must establish by a preponderance of the evidence that the claims are to be governed by § 112, ¶ 6.").

Construing a means-plus-function limitation involves multiple steps. "The first step in construing [a means-plus-function] limitation is a determination of the function of the means-plus-function limitation." *Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*, 248 F.3d 1303, 1311 (Fed. Cir. 2001). Once a court has determined the limitation's function, "[t]he next step is to determine the corresponding structure disclosed in the specification and equivalents thereof." *Id*. A "structure disclosed in the specification is 'corresponding' structure only if the

specification or prosecution history clearly links or associates that structure to the function recited in the claim." *Id*. (citation omitted). Moreover, the focus of the "corresponding structure" inquiry is not merely whether a structure is capable of performing the recited function, but rather whether the corresponding structure is "clearly linked or associated with the [recited] function." *Id*. If the specification fails to disclose adequate structure linked or associated with the recited function, then the claim element is invalid as indefinite. *See Noah Sys. Inc. v. Intuit Inc.*, 675 F.3d 1302, 1311–12 (Fed Cir. 2012).

### III. CONSTRUCTION OF DISPUTED TERMS

The parties dispute the meaning and scope of seven terms or phrases used in the Asserted Patents.[3] The Court takes each term or phrase in turn.

### A. "POS system"

| Disputed Term | SQWIN's Proposal | Walmart's Proposal |
|---|---|---|
| "POS system" | Not indefinite and not subject to 35 U.S.C. § 112, ¶6; no construction needed<br><br>To the extent a construction is needed, POS means "point-of-sale." | Subject to 35 U.S.C. § 112, ¶6; indefinite or lacks sufficiently definite structure |

### 1. Analysis

The term "POS system" appears in Asserted Claims 1, 4, 12, and 15 of the '176 Patent; Asserted Claims 1, 4, 12, and 15 of the '572 Patent; and Asserted Claims 1, 7,

---

[3] Walmart withdrew its proposed constructions for the following terms identified in the Joint Claim Construction Chart, (Dkt. #27): "network identifying code," "communicating," "connects/connecting/connection" and "forwarding." *See* (Dkt. #30 at 5 n.3); (Dkt. #33 at 10 n.3).

9, 14, 21, 24, 25, and 31 of the '168 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same general meaning in each claim.

The parties' primary dispute is whether this term is a "means-plus-function" term governed by 35 U.S.C § 112(f) (pre-AIA 35 U.S.C § 112, ¶ 6). Walmart asserts the term is governed by Section 112(f) and the specification does not disclose structure corresponding to claimed functions of the POS system, and thus the term is indefinite under 35 U.S.C. § 112(b) (pre-AIA 35 U.S.C § 112, ¶ 2). (Dkt. #30 at 7–9). SQWIN asserts the term is not governed by Section 112(f) and no construction is necessary. (Dkt. #29 at 11–13).

There is no dispute that "POS system" does not include the word "means" and thus there is a rebuttable presumption that Section 112(f) does not apply. *See Williamson*, 792 F.3d at 1349. To overcome that presumption, Walmart must "demonstrate[] that the claim term fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function." *Id.* (internal quotations and citation omitted). "The standard is whether the words of the claim are understood by persons of ordinary skill in the art to have sufficiently definite meaning as the name for structure." *Id.* (citing *Greenberg*, 91 F.3d at 1583).

At the outset, the parties dispute whether Walmart can overcome the presumption that Section 112(f) does not apply without providing extrinsic evidence (*e.g.*, an expert declaration) on the level of skill of an ordinary artisan in this field and analyzing the term "POS system" from such a person's perspective. According to

SQWIN, Walmart was required to submit extrinsic evidence to show how a person of ordinary skill in the art ("POSITA") would understand "POS system." (Dkt. #31 at 1–2) (citing *Mobile Equity Corp. v. Walmart Inc.*, No. 2:21-cv-126-JRG-RSP, 2002 WL 218984 at *8 (E.D. Tex. Jan. 25, 2022)) ("Walmart fails to explain who such a skilled artisan is, much less analyze the term from such a person's perspective. The Court must therefore conclude Walmart has not carried its burden of showing applicability of § 112, ¶ 6.").

Walmart responds that extrinsic evidence is not required in every case and there is sufficient intrinsic evidence to rebut the presumption that "POS system" does not connote structure to a POSITA. (Dkt. #33 at 2–3) (citing *Diebold Nixdorf, Inc. v. Int'l Trade Comm'n*, 899 F.3d 1291, 1299 (Fed. Cir. 2018)). In *Diebold*, the Federal Circuit held that "in appropriate cases, a party advocating that a claim limitation that does not recite the word 'means' is subject to [Section 112(f)] can overcome the presumption against its application solely by reference to evidence intrinsic to the patent." *Diebold*, 899 F.3d at 1299–30. Consistent with *Diebold*, this Court will not apply a bright-line rule that Walmart must present extrinsic evidence to carry its burden to overcome the presumption that Section 112(f) does not apply. Instead, the Court will evaluate the intrinsic evidence and available extrinsic evidence to determine whether the presumption has been overcome.

Walmart makes several arguments based on the intrinsic evidence. First, Walmart argues "system" is a nonce term that connotes no specific structure and is merely a substitute for "means for." (Dkt. #30 at 6). But the term being construed is

"POS system," not "system" standing alone. The relevant issue is not whether "system" denotes sufficient structure, but rather whether "POS system" has a sufficiently definite meaning as the name for structure. *Williamson*, 792 F.3d at 1349. On the relevant issue, Walmart asserts "[t]here is no agreed structure for what 'POS system' means to one skilled in the art," but provides no support for this conclusion. (Dkt. #30 at 6). Walmart cannot overcome the presumption based on unsupported attorney argument.

Second, Walmart argues the claims recite functions performed by the "POS system," but do not recite sufficient structure for performing those functions. (Dkt. #30 at 7). Walmart's argument, however, begs the question. Walmart's argument starts with the conclusion that "POS system" is not sufficient structure and then concludes there is no ***other*** structure for performing the functions. But the issue at hand is whether "POS system" itself has a sufficiently definite meaning as the name for structure. If so, then the term is not governed by Section 112(f) and no ***other*** structure is required. *Williamson*, 792 F.3d at 1349.

Third, Walmart argues that in the prior art cited during the prosecution history of the '176 Patent, the term "POS system" only appears once and its use is not related to any structures or functions. (Dkt. #33 at 2). Prior art references cited during the prosecution history of a patent are part of the intrinsic evidence. *See Kumar v. Ovonic Battery Co.*, 351 F.3d 1364, 1368 (Fed. Cir. 2003). For the '176 Patent, there were ten U.S. patent documents cited during the prosecution of the patent. To support its argument that a POSITA would not understand "POS system"

to have a sufficiently definite meaning as the name for structure, Walmart points out that only one of the cited prior art references (U.S. Pat. Pub. 2013/0091059A1) uses the term "POS system." While "POS system" may only be used once in the cited prior art, another cited prior art reference (U.S. Pat. Pub. 2011/0078031A1) uses the terms "POS device," and "POS" repeatedly to refer to structures. *See, e.g.*, *id.* at Fig. 2 (POS 104); ¶ 34 ("Point of sale device (POS) 104 may include various components . . . ."); ¶ 39 ("POS 104 may be any physical device at any location where a user may make a payment for purchased goods and/or services."). Although "POS device" and "POS" may have different scopes than "POS system," the Court finds that the use of "POS device" and "POS" in the intrinsic record to refer to structure weakens rather than supports Walmart's position.

Moreover, Walmart's argument ignores the use of the term "POS system" in the specification, which is "the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315. The '176 Patent explains the "cash register/POS system" is "in the department store." '176 Patent col. 7 ll. 48–51; *see also id.* at col. 2 ll. 8–12 (referring to "POS device"), col. 3 ll. 18–22 (referring to a "cash register" in the same manner "POS system" is used in the claims); col. 7 ll. 55–58 ("a receipt number with a final amount for the purchase is generated by the cash machine/POS system"). There is no dispute that a cash register is an example of a POS system. Further, the system may include peripheral devices such as a receipt printer so codes can be "printed out on a receipt by the POS system." *Id.* at col. 2 ll. 27–29. Walmart has provided no evidence that a POSITA would not understand the ordinary meaning of

POS system to connote well-known structure such as cash registers and receipt printers as expressly disclosed in the Asserted Patents.

At the *Markman* hearing, Walmart argued that "POS system" is a broad and unbounded term that could encompass structures that are not at the point of sale, such as a back-office server. The relevant issue, however, is whether "POS system" denotes structure or a class of structures. *See Skky, Inc. v. Mindgeek S.A.R.L.*, 859 F.3d 1014, 1019 (Fed. Cir. 2017). Even if "POS system" denotes "a broad class of structures," that is not sufficient to overcome the presumption that Section 112(f) does not apply. *See id.*

The extrinsic evidence also suggests "POS system" connotes a name for structure to a POSITA. Newton's Telecom Dictionary (a reference cited by both parties for various definitions), defines "point of sale terminal" as:

> A special type of computer terminal which is used to collect and store retail sales data. This terminal may be connected to a bar code reader and it may query a central computer for the current price of that item. It may also contain a device for getting authorizations on credit cards.

*Point of Sale Terminal*, *Newton's Telecom Dictionary* (25th ed. 2009). This definition provides that a point of sale terminal is a physical structure that can be connected to or include devices such as a bar code reader, central computer, and credit authorization device. The definition suggests a "POS system" is a class of structures comprising a "point of sale terminal" and related peripheral devices.[4] As explained

---

[4] In this regard, it is worth noting that the Asserted Patents make clear that "POS" stands for "point of sale." *See* '176 Patent col. 9 ll. 12; '572 Patent col. 9 l. 42; '168 Patent col. 9 ll. 42.

above, that is consistent with how the Asserted Patents use the term "POS system."

In sum, Walmart has not carried its burden to show the applicability of Section 112(f). Based on the intrinsic and extrinsic evidence the Court finds that Walmart has not overcome the presumption that Section 112(f) does not apply. Walmart has failed to show that "POS system" is a nonce term that fails to connote structure to a POSITA, and the intrinsic and extrinsic evidence supports SQWIN's position that Section 112(f) does not apply.[5]

## 2.  Court's Construction

Aside from arguing the applicability of Section 112(f), Walmart does not propose a construction of this term. SQWIN acknowledges that "POS" is an acronym for "point of sale." For clarity, the Court construes **"POS system"** as **"point of sale system."**

---

[5] Walmart's reliance on *Diebold* is misplaced, as *Diebold* is distinguishable on several grounds. First, unlike the term "cheque standby unit" at issue in *Diebold*, there is no evidence that "POS system" is "a coined term for the purposes of claiming the invention." *See Diebold*, 899 F.3d at 1332. Second, this is not a case in which there is no evidence that the relevant term refers to a structure or class of structures. As discussed above, the intrinsic and extrinsic evidence indicate that "POS device," "point of sale terminal," "POS," and "POS system" are terms that would connote structure to a POSITA.

## B. "payment system"

| Disputed Term | SQWIN's Proposal | Walmart's Proposal |
|---|---|---|
| "payment system" | Not indefinite and not subject to 35 U.S.C. § 112, ¶ 6<br><br>"a system that mediates between banks, customers, and merchants for payment of a proposed transaction, or a web-based social network service, or web-based email service, or instant messaging service, or mobile payment (digital wallet) service, or an online store" | Subject to 35 U.S.C. § 112, ¶6; indefinite or lacks sufficiently definite structure;<br><br>or to the extent found not indefinite:<br><br>**Function**: "determining whether unique digital code and mobile identifying code match, and offering clearance of the financial transaction"<br><br>**Structure:** "third-party software that mediates between banks, customers, and merchants such as VISA or Mastercard" |

## 1. Analysis

The term "payment system" appears in Asserted Claims 1, 6, 9, 12, and 17 of the '176 Patent; Asserted Claims 1, 6, 9, 12, and 17 of the '572 Patent; and Asserted Claims 9, 12, 14, 17, 26, 29, and 31 of the '168 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same general meaning in each claim.

The parties make many of the same arguments related to "payment system" as "POS system." Again, the primary dispute is whether Section 112(f) is applicable to the construction of this term. The term "payment system" does not include the word "means" and thus there is a rebuttable presumption that Section 112(f) does not apply. *Williamson*, 792 F.3d at 1349.

Walmart argues "system" is a nonce word, but does not cite any evidence of how a POSITA would understand the term "payment system." Walmart further argues (without support) that "payment" does not "import sufficient structure to explain how" the recited functions of the payment system are performed. But that is not the correct standard. Instead, the Court is required to determine whether "payment system" would denote sufficient structure or a class of structures to a POSITA. *Id.*

The specifications of the Asserted Patents provide specific examples of payment systems, such as VISA and MasterCard. *See, e.g.*, '176 Patent col. 2 ll. 4–5. The Court finds these exemplary payment systems would denote a definite structure or class of structures to a POSITA. Walmart has failed to provide any evidence that a POSITA would not understand the term payment system to connote structure in the context of online transaction systems. *See id.* at Title, col.1 l. 6. Without intrinsic or extrinsic evidence to the contrary, the Court holds that Walmart has not carried its burden to show the applicability of Section 112(f).

Having resolved the Section 112(f) issue, the Court turns to the construction of "payment system." First, the parties dispute whether "payment system" includes "transaction networks." The Asserted Patents state: "Payment Systems comprise traditional systems like VISA® or MasterCard® or alternative transaction networks." *See, e.g.*, '176 Patent col. 2 ll. 4–5. SQWIN argues this passage should be understood to broaden the term "payment system" to include all transaction networks regardless of whether the transaction network handles payment transactions.

22

(Dkt. #29 at 13). SQWIN reads too much into the passage. In context, the passage means payment systems include traditional systems (that handle payment transactions) and alternative transaction networks (that handle payment transactions). The passage does not broaden "payment system" to include transaction networks that do not handle payment transactions, which would effectively read "payment" out of "payment system."

While a patentee can define terms contrary to their plain and ordinary meaning, the patentee must "clearly express an intent to define the term" with "reasonable clarity, deliberateness, and precision." *See Thorner*, 669 F.3d at 1365; *Renishaw*, 158 F.3d at 1249. The above passage is not sufficiently clear to redefine "payment system" to include non-payment transaction networks.

At the *Markman* hearing, Walmart sought to modify the construction of "payment system" to indicate it is separate from the "POS system." While the Court declines to include this clarification in the construction of "payment system," the Court agrees with Walmart that other language in the Asserted Claims dictate that the payment system is separate from the POS system. For example, Claim 1 of the '176 Patent requires transmitting data from the POS system to the payment system via a network path. '176 Patent col. 9 ll. 38–42.

## 2.  Court's Construction

With respect to the proper construction of "payment system," the parties' proposed constructions are similar. SQWIN proposes: "a system that mediates between banks, customers, and merchants for payment of a proposed transaction." Walmart proposes: "third-party software that mediates between banks, customers,

and merchants such as VISA or Mastercard." The Court rejects Walmart's proposal to limit payment system to "third-party software" because there is no support in the intrinsic record for doing so.

Noting the similarity in the parties' proposed constructions, and for the above reasons, the Court construes **"payment system"** as **"a system that mediates between banks, customers, and merchants for payment of a proposed transaction."**

## C. "network"

| Disputed Term | SQWIN's Proposal | Walmart's Proposal |
|---|---|---|
| "network" | "connected devices that share information" | "Wi-Fi, WLAN, or local wireless network" |

### 1. Analysis

The term "network" appears in Asserted Claims 1 and 21 of the '168 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same general meaning in each claim.

Walmart's proposed construction incorrectly limits "network" based on preferred embodiments disclosed in specification. "[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Liebel-Flarsheim*, 358 F.3d at 913. Walmart has not identified any such clear indication here.

Walmart admits the plain and ordinary meaning of "network" can be broader than its proposed construction and thus it is limiting the ordinary meaning based on the specification. (Dkt. #30 at 20) ("Walmart does not contest that the terms 'wireless

network' and 'network' can have a broader meaning . . . in regular parlance . . . ."). To support narrowing the plain and ordinary meaning, Walmart argues "it is clear that the '176 patent only had one type of . . . 'network' in mind: that is 'WiFi, WLAN, or wireless local network.'" (Dkt. #30 at 21).

> Walmart's argument is not supported by the specification, which discloses:

> [T]he code can also be sent to the mobile device via ***a network***. ***In this case***, the . . . code is sent via a ***wireless connection*** from the POS system to the mobile device, ***preferably*** by NFC or Bluetooth or WLAN . . . .

'176 Patent col. 2 ll. 30–35 (emphases added). The specification discloses "a network" without limitation as to whether it is wired or wireless. It also discloses an embodiment in which the network is a "wireless network," and three preferred types of wireless networks: NFC, Bluetooth, and WLAN. The Court disagrees that the Asserted Patents only disclose one type of network.

Walmart also cites several passages in the specification that relate to specific examples that use local wireless networks. (Dkt. #30 at 18). These passages do not indicate a clear intent to limit the term "network" to only wireless networks, let alone WiFi, WLAN, or local wireless networks. Thus, it would be incorrect to import limitations into the claims, and the Court finds that "network" should have its plain and ordinary meaning. *See Liebel-Flarsheim*, 358 F.3d at 913. Tellingly, Walmart proposes the same construction for the term "wireless network," discussed below, which would render the word "wireless" meaningless if both "network" and "wireless network" were construed to have the same meaning.

SQWIN's proposed construction, "connected devices that share information," is

25

consistent with the plain and ordinary meaning of "network." *See, e.g.*, *MyMail Ltd v. Am. Online, Inc.*, No. 6:04-cv-189, 2005 WL 6225308, at *7 (E.D. Tex. June 3, 2005) (construing "network" as a "system of interconnected computers that have the ability to communicate"). Walmart concedes "that 'network' can generally mean interconnected devices" and does not dispute that the interconnected devices can share information. (Dkt. #30 at 21). Indeed, the specification explains the network is used to "communicate [] information." '176 Patent col. 4 ll. 46–50.

### 2. Court's Construction

For the above reasons, the Court construes **"network"** to have its plain and ordinary meaning, and clarifies that meaning to be **"interconnected devices that share information."**

### D. "wireless network"

| Disputed Term | SQWIN's Proposal | Walmart's Proposal |
|---|---|---|
| "wireless network" | "a network where one or more of the connections is wireless" | "Wi-Fi, WLAN, or local wireless network" |

### 1. Analysis

The term "wireless network" appears in Asserted Claims 1 and 12 of the '176 Patent and Asserted Claims 1 and 12 of the '572 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same general meaning in each claim.

As with the term "network" addressed above, Walmart's proposed construction limits "wireless network" to specific types of wireless networks. Walmart argues that "Wi-Fi, WLAN, or local wireless network" is not just the preferred embodiment, but

the only embodiment of a wireless network. (Dkt. #30 at 21). Even if Walmart's position were accurate, it is seldom proper to limit claims to the only disclosed embodiment. *See Liebel-Flarsheim*, 358 F.3d at 913. But Walmart's argument is also inaccurate. As noted above, the specification discloses both wireless networks generally and preferred embodiments of wireless networks—WLAN, NFC, and Bluetooth (which are examples of local wireless networks). *See, e.g.*, '176 Patent col. 2 ll. 31–35. Thus, the Asserted Patents disclose more than one type of wireless network.

Walmart also argues that the specification uses "the terms 'wireless local network,' 'network,' 'WiFi,' and 'WLAN' interchangeably." (Dkt. #30 at 17–18). The Court disagrees. First, several of the passages cited by Walmart are expressly preferred embodiments. "***In this case***, the wireless local area network is a WiFi (hereinafter—'WiFi' or 'WLAN')." '176 Patent col. 2 ll. 52–53; *see also id.* at col. 3 ll. 50–54 ("in this case"). Other passages are taken out of context. For example, the references to a WLAN as a wireless network in col. 8 ll. 9–12 and ll. 64–66 are disclosed as steps of a "possible embodiment." *See id.* col. 7 ll. 42–43. Last, the reference to a "wireless local area network" as "the wireless network" in the Abstract does not "clearly express an intent to define the term" with "reasonable clarity, deliberateness, and precision." *See Thorner*, 669 F.3d at 1365; *Renishaw*, 158 F.3d at 1249.

At the *Markman* hearing, Walmart also argued that deleting "WiFi" and "WLAN" from the specifications of the '572 and '168 Patents is an admission that the

27

claims of the '176 Patent are limited to WiFi and WLAN. As best understood, Walmart argues deleting "WiFi" and "WLAN" from the specifications of the later-filed patents was necessary to support broader claims of those patents, which recite "network" as opposed to "wireless network." According to Walmart, the Court should interpret the amendments to be an admission that the specification of the '176 Patent only supports WiFi/WLAN and thus the claims should be limited to those types of networks. Walmart admits its argument is novel and does not cite any authority in support thereof. The Court rejects Walmart's invitation to adopt a novel theory based on inferences drawn from amendments made in other patents,[6] and will instead focus its analysis on the intrinsic evidence of each Asserted Patent.

Last, Walmart argues that references to "the local wireless network" in the prosecution history justify limiting the scope of the "wireless network." (Dkt. #33 at 8–9). "For a statement during prosecution to qualify as a disavowal of claim scope, it must be 'so clear as to show reasonable clarity and deliberateness,' and 'so unmistakable as to be unambiguous evidence of disclaimer.'" *Genuine Enabling Tech. LLC v. Nintendo Co.*, 29 F.4th 1365, 1374 (Fed. Cir. 2022) (citations omitted). The Court does not find the prosecution statements to be clear and unambiguous disclaimers that justify limiting the scope of the claim.

## 2. Court's Construction

For the above reasons, the Court holds that "wireless network" should have its plain and ordinary meaning. Walmart does not dispute that SQWIN's proposed

---

[6] The Court makes no findings regarding the priority dates of the asserted claims.

construction is consistent with that plain and ordinary meaning. Thus, the Court construes **"wireless network"** as **"a network where one or more of the connections is wireless."**

### E. "first digital network path"

| Disputed Term | SQWIN's Proposal | Walmart's Proposal |
| --- | --- | --- |
| "first digital network path" | No construction necessary | "a point-to-point communications path, separate and distinct from the second digital network path, for information represented by binary bits" |

### 1. Analysis

The term "first digital network path" appears in Asserted Claims 1 and 12 of the '176 Patent; Asserted Claims 1 and 12 of the '572 Patent; and Asserted Claims 1, 9, 14, 21 and 31 of the '168 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same general meaning in each claim.

There are three disputes regarding this term: 1) whether a digital network path is limited to a "point-to-point" path; 2) the proper construction of digital; and 3) whether the first and second paths must be "separate and distinct" (i.e., no overlapping components).

First, Walmart does not cite any support for limiting "network path" to a point-to-point communications path, and the Court does not find any support in the intrinsic evidence for adding this limitation. Even the extrinsic dictionary definitions cited by Walmart do not support this limitation. (Dkt. #30 at 14).

With regard to the construction of "digital," Walmart cites to a dictionary definition: "any device that represents values in the form of binary digits or bits."

(Dkt. #30 at 14) (citing *Digital*, *Dictionary of Computer Networking* (1st ed. 2011)). SQWIN agrees "digital" is the opposite of "analog," but does not provide a competing construction. (Dkt. #29 at 17). SQWIN argues that adopting Walmart's dictionary definition of "digital" would exclude an embodiment of a "digital code" disclosed in the specification in which "[t]he unique digital code can contain any number of digits or letters." *See* (Dkt. #29 at 17). But SQWIN's concern is misplaced. Construing digital as binary digits or bits does not exclude a code of "digits and letters," as long as those digits and letters are expressed in digital form.

SQWIN also argues Walmart's dictionary definition of "digital" is limited to technologies with two states (binary) and excludes technologies with three states (ternary). Whether ternary technology is digital might be an interesting academic issue, but it is not an issue relevant to these proceedings. At the *Markman* hearing, SQWIN conceded that ternary technology is rare and there is no indication that it is relevant here. SQWIN agreed to the dictionary definition of "digital," with the proviso that if the difference between binary and ternary technology becomes relevant, the construction would be revisited.

Last, the parties dispute whether the first and second network paths can have overlapping elements. Walmart's proposed construction requires the paths to be "separate and distinct" i.e., with no overlapping elements. In contrast, SQWIN acknowledges that the paths must be different (non-identical) but asserts the paths can have overlapping elements.

Walmart cites to the following portion of the specification to support its

30

construction:

> The principle of the present invention is the separation of the **information flows** from the purchaser and vendor at the time of the purchase. Each party sends its **information package** to the payment system via its communication channel. Therefore, on each purchase, two independent information packages are sent to the payment system.

(Dkt. #30 at 15) (citing '176 Patent col. 1 ll. 26–31 (emphases added)). This passage indicates data (information flows or packages) must be separate and distinct, but does not indicate that the paths transmitting that data are separate and distinct. Without any support in the intrinsic record for requiring non-overlapping paths, the Court holds the paths must be different (non-identical), but not necessarily separate and distinct.

## 2. Court's Construction

For the above reasons, the Court construes **"digital network path"** as **"a network path that represents values in the form of binary digits or bits,"** and construes **"first digital network path"** as **"a digital network path that is not identical to the second digital network path."**

## F. "second digital network path"

| Disputed Term | SQWIN's Proposal | Walmart's Proposal |
|---|---|---|
| "second digital network path" | No construction necessary | "a point-to-point communications path, separate and distinct from the first digital network path, for information represented by binary bits" |

## 1. Analysis

The term "second digital network path" appears in Asserted Claims 1 and 12 of the '176 Patent; Asserted Claims 1 and 12 of the '572 Patent; and Asserted Claims

1, 9, 14, 21 and 31 of the '168 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same general meaning in each claim. The parties generally make the same arguments for this term as "first digital network path" addressed above. The same reasoning applies.

**2. Court's Construction**

For the reasons discussed above with respect to "first digital network path," the Court construes **"second digital network path"** as **"a digital network path that is not identical to the first digital network path."**

**G. "password"**

| Disputed Term | SQWIN's Proposal | Walmart's Proposal |
|---|---|---|
| "password" | No construction necessary | "a security code that identifies a specific, authorized user in order to allow access to a wireless network that others otherwise cannot access" |

**1. Analysis**

The term "password" appears in Asserted Claims 1 and 12 of the '176 Patent and Asserted Claims 1 and 12 of the '572 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same general meaning in each claim.

"Password" is a common term and there is no indication that the Asserted Patents ascribe a special meaning to the term. Consistent with the plain and ordinary meaning, the Court proffered a preliminary construction of "a word or string of characters recognized by automatic means permitting a user access to a place or to protected storage, files or input or output devices." *See Password*, *Newton's Telecom*

*Dictionary* (25th ed. 2009). At the *Markman* hearing neither party objected to the Court's preliminary construction and the Court hereby adopts that construction.

## 2.  Court's Construction

For the above reasons, the Court construes **"password"** as **"a word or string of characters recognized by automatic means permitting a user access to a place or to protected storage, files or input or output devices."**

### IV.  CONCLUSION

The Court adopts the above constructions. The parties are ordered to not refer, directly or indirectly, to each other's claim-construction positions in the presence of the jury. Likewise, the parties are ordered to refrain from mentioning any part of this opinion, other than the definitions adopted by the Court, in the presence of the jury. The parties are also reminded that the testimony of any witness is bound by the Court's reasoning in this order but that any reference to claim-construction proceedings is limited to informing the jury of the definitions adopted by the Court.

**So ORDERED and SIGNED this 8th day of December, 2023.**

_____
SEAN D. JORDAN
UNITED STATES DISTRICT JUDGE